[No. 2439.]

## W. L. PATILLO v. THE STATE.

1. MURDER—SELF DEFENSE—CHARGE OF THE COURT.—The trial court, in a murder case, charged the jury upon the issue of self defense as follows: "When a person is attacked by another person, it is not necessary that he should retreat in order to avoid the necessity of defending himself from the assault of his assailant, but he may stand his ground and repel such assault, and if there is danger or apparent danger of losing his life or of suffering serious bodily harm at the hands of his assailant, he may in such case take the life of his assailant for the purpose of protecting himself from such danger or apparent danger." This charge was excepted to because it failed to instruct the jury that they were to consider the apparent danger as it appeared to the defendant. *Held*, that the objection was well taken. See the opinion *in extenso* for a discussion of the question, and for a special charge upon the subject *held* to have been erroneously refused.

2. SAME—THREATS.—See the statement of the case for a charge of the court upon the subject of threats *held* correct in view of the facts in proof, and for a special charge upon the same subject *held* to have been properly refused in view of the evidence.

APPEAL from the District Court of Bosque. Tried below before the Hon. J. M. Hall.

The indictment in this case charged the appellant with the murder of Daniel Bibles, in Bosque county, Texas, on the fourth day of April, 1886. His trial resulted in his conviction of murder in the second degree, his punishment being assessed at a term of ten years in the penitentiary.

J. A. Bibles, the father of the deceased, was the first witness for the State. He testified, in substance, that he lived at the village of Walnut Springs, Bosque county, Texas, which village was situated on the Texas Central railroad. Witness last saw his son Daniel alive at about half past nine o'clock on the night of April 4, 1886, at which hour he came to witness's door, called to witness to open, as he was shot. Witness admitted Daniel, struck a light and saw that his shirt was bloody. Witness heard shooting in the direction of the depot about five minutes before Daniel arrived at home. Deceased told witness that the defendant shot him, and witness went after Doctor Poole. Doctors

Poole and James reached the house about fifteen minutes later. The witness asked the deceased what was the cause of his difficulty with the defendant. Deceased first said that he could not tell witness, and then said, sententiously: "It was about a girl." He died about an hour and a half later. Deceased was a single man, twenty-four years of age, and weighed between one hundred and forty-five and one hundred and sixty pounds. Witness lived about eighty yards from the depot, and about fifty yards from the place of the shooting. Deceased ate a cold supper at home that evening about sundown. When he came home after he was shot his left coat sleeve was on fire.

Doctor T. C. Poole, testifying for the State, described the three wounds he found on the body of the deceased, two of which were mortal, and the third superficial. Witness asked deceased why Willie Patillo shot him, and he first declined to say, but finally said it was about a girl. Witness asked him if he shot at Patillo. He replied that he did not, as he had nothing to shoot with. Deceased was a well developed young man of about one hundred and sixty pounds weight, and much larger and heavier than the defendant.

M. F. Sellers testified, for the State, that he lived at Walnut Springs in April, 1886, and was then employed as a locomotive fireman on the Texas Central railroad. Witness came into Walnut Springs on the up train, about half past nine o'clock on the night of April 4, 1886. It was a dark night, and witness had a lighted lantern in his hand when he stopped at the east end of the depot building for a minute or two, and then started home. When the witness reached a point about forty yards distant from the depot he heard three or four shots fired at a point between fifty and sixty yards distant from where he (witness) then was. Witness saw the flashes of the pistol and called out: "Look out, there! You might shoot some body." He heard no reply.

On his cross examination, the witness said that, at the time of the shooting, a stiff wind was blowing from the direction of the point where the pistol shots were fired, and was making a rattling noise against the depot office. The engine was backing and puffing when the shots were fired.

Pat Bradley testified, for the State, that he was the proprietor of a restaurant at Walnut Springs at the time of the shooting, and knew both the deceased and the defendant. Witness's place of business was nearly opposite the railroad depot, and about

one hundred and twenty-five feet distant. Witness heard the shots, which were fired at about thirty-five minutes past eight o'clock. The witness had been to meet the up train, which reached the depot at half past nine o'clock. Defendant and two other parties were in the witness's restaurant about an hour and a half before the shooting, eating oysters. On his way back from the train, the witness saw the deceased standing in front of Ferguson's saloon, which adjoins witness's house. · The saloon was then closed. Witness spoke to deceased and passed into his house. Deceased then walked to the front of witness's restaurant and then back in the direction of the saloon. About five minutes later witness heard the shots. He then ran to the corner of the street, looked up and down the street, having his lantern with him, but saw no one. He then went further up the street and saw the deceased go to the door of his father's house, and heard him ask his father to let him in. Witness thought the shots were fired behind the saloon on the east side of the street running north and south.

Two witnesses for the State testified that they examined the person of the deceased, when he died, and found no weapon about him other than a closed pocket knife. Deceased's watch was dented, and a flattened bullet was found in one of his socks.

Stephen McLennan testified, for the State, that he saw the defendant at Bobo's boarding house about sun down on the fatal day, and heard him say that "somebody had to eat dirt before morning." On his cross examination, the witness said that the defendant was drinking at the time, and he paid no attention to what he said.

D. H. Maggard testified, for the State, that he was at the oyster supper at Bradley's on the evening of but before the shooting and heard the defendant say that he was going to "paint the town red" the next day. By "painting the town red" the boys generally meant getting on a spree.

J. F. Paty testified, for the State, that he lived at Walnut Springs, about three hundred yards distant from the railroad depot. Deceased came to witness's house about dusk and left at five minutes to nine o'clock on the fatal night. To go from witness's house to old man Bibles's house one would have to cross the railroad track about one hundred yards west from the depot and pass by Ferguson's saloon.

J. M. Hill testified, for the State, that he knew that the de-

ceased owned a small five shooting pistol at the time of the shooting, but he knew, also, that deceased did not have that pistol with him on the night of the tragedy. That pistol had been for weeks kept on a shelf at Bobo's. Witness did not know the condition of the pistol described. The State rested.

Frank Barbee testified, for the defense, that he kept a pistol at his livery stable in Walnut Springs. Witness missed it several weeks before the shooting of Dan Bibles. Witness told Dan Bibles, on the day before the killing, that he wanted him to bring his pistol back to the stable and the pistol was found at the stable on that day. Witness did not know as a fact that deceased had his pistol.

John Mayfield testified, for the defense, that he was in Flowers's saloon in Walnut Springs some six or seven weeks before the shooting of the deceased by the defendant. Defendant and deceased were then engaged in a game of pool. Deceased ordered defendant to hush singing, and, as defendant did not obey, he struck the defendant across the breast with a billiard cue. Defendant pulled the cue from the hands of the deceased and·pushed him down. The two clinehed and were separated by bystanders. Defendant walked to the saloon counter, leaned against it and told deceased that he had no ill feeling towards him. Deceased persistently endeavored to break loose from two parties holding him to assault the defendant. One of the parties said to deceased: "Dan, you would not hit Willie (defendant), would you? He is one of your best friends." Deceased replied: "No, d—n him, I would not hit him, but I will shoot him," throwing his right hand to his hip pocket. Mr. Hill corroborated this witness and added that when deceased threw his hand to his hip pocket he, Hill, felt of that pocket, found it empty and told defendant that deceased did not have a pistol. Defendant and deceased were both drunk on that occasion.

R. F. Ferguson, testified, for the defense, that he saw a difficulty between the defendant and the deceased two or three weeks before the fatal shooting. It occcurred in a saloon. Deceased was pushing some balls about a billiard table with a cue, no one playing at the time. Defendant stepped to the table, laughing, and caught the end of deceased's cue. Deceased said to him: "D—n you, I'll knock you down," and raised his cue as if to strike. Witness interposed between them, and defendant said to deceased: "Dan, I have nothing against you. If you

have anything against me, let's go across the railroad and fight it out fairly." Defendant shortly after left the saloon, and deceased resumed his practice on the billiard table. Deceased presently remarked to the crowd: "If I ever have another fuss with Will Patillo, I'll cut his God d—d heart out and kick it about like a foot ball," and then as if talking to himself, he said: "I'll cut his God d—d heart out." He repeated the threats several times. Dan Bibles's reputation was that of a quiet peaceable, law abiding citizen when sober, but quarrelsome and violent when drinking. On the day following the occurrances at the saloon mentioned, witness told the defendant what deceased said about cutting his heart out. This witness was corroborated by others as to the reputation of deceased for peace and quietude when sober, and violence when drinking.

Ramsey Cox, the railroad station master at Walnut Springs, testified for the defense, that he saw the defendant and the deceased together on the depot platform about six o'clock on the fatal evening. Deceased was not then drunk, but appeared to be drinking. The two were quarrelling and cursing. After a short time deceased produced a flask of whisky and took a drink. He then passed it to defendant, who took a drink and returned it. Deceased put the flask back into his pocket, and said to defendant: "What I have said is so, and I don't take it back!" Deceased then put his hand in his overcoat pocket, and defendant asked: "What does that mean?" Deceased replied: "That is none of your d—d business." Defendant said to him: "Dan, this is the third fuss you have raised with me, and if you do it again you had better look out." The deceased replied: "I will raise a fuss with you as often as I d—d please." Witness then stepped forward and said: "There is no use in you two quarreling; come on, Patillo, let's go to supper." Witness and defendant, who boarded at the same place, then went to supper, passing Ferguson's saloon, which was on their direct route. Witness went calling after supper, and returned to the depot about thirty-five minutes past nine o'clock, being a few minutes tardy. Just as the witness got his key inserted into the lock of the depot door, three or four shots were fired. Witness went to the east end of the depot, some fifteen or twenty feet distant, looked up the street and saw nothing. Two parties went to the end of the depot with the witness. One of those parties remarked that shooting in that town was common and indicated nothing, and witness went back into the depot.

In going from the depot door to the corner, and thence into the depot, he occupied about a minute of time. He occupied another half minute at the telegraph instrument, reporting the train. He then wrote a short letter, occupying perhaps three minutes. He then spoke a few words to some boys present, and closed the depot and started home. When he reached a point on the platform, about twenty-five steps from his door, the defendant appeared and said: "Hold on, Cox, I want to tell you something." Not less than five nor more than fifteen minutes had then elapsed since the shooting. Defendant said: "I have shot Dan Bibles." Witness replied: "The h—ll you have!" Defendant said: "Yes, but I don't know whether I killed him or not." Witness then asked defendant how the shooting occurred. He said: "I was on the depot platform immediately after the train came in. Dan Bibles passed me, looked in my face, and then turned back and passed me again. I waited until I thought Dan had time to get home. Then I started, and after passing Ferguson's saloon, Dan Bibles called to me to hold on. I was on the side walk, a few yards past the saloon. Dan came up cursing me, and asked why I didn't drink with him this evening, and I told him that I would not drink with any man that would talk about a girl as he had. Then Dan advanced on me and threw his hand behind him. I told him to stop and he kept on advancing, and I shot him." Witness advised defendant to leave, and said to him: "You know where my horse is, and I have three hundred dollars which is at your service." Defendant said: "No, I shot Bibles in self defense and I won't leave." About thirty minutes later witness and defendant went to the house of Deputy Sheriff Slider, and defendant surrendered.

Cross examined, the witness said that he and the defendant were friends. Witness loaned defendant a pistol on the evening of the difficulty, and defendant returned it after the shooting.

John M. Flowers testified, for the defense, that, about thirty minutes before sunset on the fatal day, deceased applied to him for the loan of a pistol, but did not get it.

Conductor Mahone testified, for the defense, that when he reached Walnut Springs on the nine thirty up train on the night of the tragedy, he saw defendant standing on the platform. Cox was about, but witness did not see the deceased.

Joseph Cree testified, for the defense, that he had known deceased about two years at the time of his death, and knew that

during that time the deceased generally carried a pistol. The defense closed.

Deputy Sheriff Slider testified, for the State, in rebuttal, that he had been the deputy sheriff, stationed at Walnut Springs for two years preceding the killing of Bibles. He had never arrested Dan Bibles for a violation of law, nor had a complaint for carrying a pistol ever been made against deceased. Cox and defendant came to the witness's house at about half past ten o'clock on the night of the killing, and defendant surrendered.

The motion for new trial raised the questions discussed in the opinion.

*Lockett & Lockett, J. A. Martin* and *Anderson, Flint & Anderson,* filed an able brief and argument for the appellant.

*J. H. Burts,* Assistant Attorney General, for the State.

WHITE, PRESIDING JUDGE. Appellant's conviction in the lower court was for murder in the second degree, with punishment assessed at ten years in the penitentiary.

It is made to appear by the evidence that, some two or three weeks prior to the homicide, appellant and deceased, Dan Bibles, had a difficulty in a billiard saloon, in which the deceased attempted to strike defendant with a billiard cue, but was prevented. After defendant left, the deceased said: "If ever I have another fuss with Will Patillo, I'll cut his G—d d—d heart out and kick it around like a foot ball." Then, as if talking to himself, he said: "I'll cut his G—d d—d heart out." Defendant was told of this threat the next day by the witness Ferguson. It was in evidence that the deceased was peaceable when sober, but quarrelsome, violent and dangerous when drinking. The homicide occurred at about nine thirty-five o'clock in the evening. About six o'clock that evening, the parties, deceased and defendant, were seen on the depot platform, quarreling and cursing each other; deceased was drinking.

There was no eye witness to the shooting, but defendant's statement as to how it occurred, made to the witness Cox within between five and fifteen minutes after it had taken place, was as follows: I was on the depot platform immediately after the train came in. Dan Bibles passed me, looked in my face and then turned back and passed me again. I waited until I thought Dan had time to get home. Then I started, and after passing

.Ferguson's saloon, I was on the side walk and a little past the saloon—a few yards—Dan Bibles called to me to hold on. Dan came up, cursing me, and asked me why I did not drink with him this evening, and I told him I would not drink with any man that would talk about a girl, like he had. Then Dan advanced on me and threw his hand behind him. I told him to stop, and he kept advancing, and I shot him." Deceased was wounded four times, two of them—one of which was in the back—being mortal. After the shooting, and when deceased had reached his father's house and was undressed, his clothing was searched for weapons, and nothing was found in them except a pocket knife in his pants pocket, and it was unopened.

Numerous exceptions were taken to the charge of the court to the jury, and whilst that portion relative to murder of the first degree is seriously objectionable in some respects, we do not deem it necessary to discuss it, since defendant was acquitted of that degree of murder. As to murder of the second degree, we see nothing very seriously or radically defective in said charge.

We propose mainly to notice the instructions upon self defense. As given in the general charge the law upon this branch of the case is thus stated, viz: "When a person is attacked by another person it is not necessary that he should retreat in order to avoid the necessity of defending himself from the assault of his assailant, but he may stand his ground and repel such assault; and if there is danger, or apparent danger, of losing his life, or of suffering serious bodily harm, at the hands of his assailant, he may, in such case, take the life of his assailant, for the purpose of protecting himself from such danger or apparent danger." This charge was specially excepted to because it failed to instruct the jury that they were to consider the apparent danger as it appeared to defendant.

The objection is well taken. Without explanation the jury would naturally consider appearances of danger as they appeared to them from the evidence, and not as they appeared to the defendant at the time he acted in the premises. The jury could see from the evidence before them that deceased, though he threw his hand behind him, did, in fact, have no pistol, and might conclude from that fact that there was no apparent danger. But the question was not how it appeared to them in view of the evidence, but how did the matter appear to defendant? "It is a rule not only statutory but of almost universal accepta-

tion that a party may act upon reasonable appearances of danger, and that whether the danger is apparent or not is always to be determined from defendant's standpoint." (Brumley v. The State, 21 Texas Ct. App., 223, and authorities there collated; Bell v. The State, 20 Texas Ct. App., 445; Horbach v. The State, 43 Texas, 242.)

Defendant's counsel attempted to correct this defect in the charge by a requested instruction which the court refused, and which was as follows, viz: "If the jury believe from all the facts before them, that deceased, Daniel Bibles, made an assault upon defendant, W. L. Patillo, and that the assault was made in such manner as to reasonably cause defendant to apprehend that his life was in danger, or that he was in danger of serious bodily injury, from the assault, then defendant would be permitted by the law to defend himself by any means in his power, and if he commenced to shoot as a means of defense, he would be justified in continuing to shoot until he had reason to believe that he was out of danger."

We are of opinion the court did not err in refusing the second special requested instruction, with regard to threats. As therein announced, the legal proposition would be correct if the threats were uncommunicated, as was held in the celebrated case of Stokes for the killing of Fisk. (53 New York, 164; Whart. on Hom., 3 ed., sec. 694; Horrigan & Thompson Self Defense, 927.) But this is not the rule with regard to communicated threats. In such case the presumption is as great, to say the least of it, that the threatened party would commence the attack as that it would be commenced by the party making the threats. We are of opinion the charge of the court, as given, presented correctly the law of threats as laid down in Article 608, Penal Code, and as applicable to the facts of the case.

But, for the error of the charge as above pointed out, and for error in refusing defendant's special instruction, *supra*, the judgment is reversed and the cause remanded.

*Reversed and remanded.*

Opinion delivered December 15, 1886.

[Judge Hurt has doubts about the distinction made between the rule as to communicated and uncommunicated threats.]